## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

ALICIA CINTRON,

        Plaintiff,

    v.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

Civ. No. 2:13-cv-7125 (KM)

**OPINION**

**KEVIN MCNULTY, U.S.D.J.:**

Alicia Cintron brings this action pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) to review a final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income ("SSI"). Cintron alleges that she is unable to engage in substantial gainful activity because she suffers from depression, anxiety, and panic attacks. (Pl. Letter[1] 1, ECF No. 10).

Because the Administrative Law Judge misapplied the step-two analysis of the five-step process for adjudicating claims, I will remand this matter for further proceedings. Cintron raises other claims of error: essentially, that the ALJ failed to discharge his special duty to develop the record when an applicant appears pro se, and erred in his evaluation of the medical records in the case. As the analysis proceeds past step two on remand, those objections may be mooted. On remand, the ALJ should: 1) further develop the record regarding Cintron's impairments, 2) evaluate the Norgren report; and 3) provide justifications for why certain reports have been discredited, in whole or in part.

---

[1] This letter, and all briefing, was submitted pursuant to L. Civ. R. 9.1.

## I.  BACKGROUND

Cintron seeks DIB and SSI benefits for a period of disability beginning December 15, 2009. (Administrative Record 107–112, 114–118, ECF No. 8). Cintron's original applications for benefits were denied (*Id.* 44–46, 52–54), and she requested that her claim be reconsidered (*Id.* 55–56). After holding a hearing, Administrative Law Judge ("ALJ") Richard De Steno denied Cintron's claim in a decision dated July 6, 2012. (*Id.* 28–29, 17–24). In a letter dated September 26, 2013, the Appeals Council denied the appeal, making the ALJ's decision the "final decision" of the Commissioner. (*Id.* 1–5). Cintron now appeals that decision.

## II.  DISCUSSION

To qualify for Title II DIB benefits, a claimant must meet the insured status requirements of 42 U.S.C. § 423(c). To be eligible for SSI benefits, a claimant must meet the income and resource limitations of 42 U.S.C. § 1382. To qualify under either statute, a claimant must show that she is unable to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted (or can be expected to last) for a continuous period of not less than twelve months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

Cintron submits that the Commissioner's decision is not supported by substantial evidence. Specifically, Cintron argues that the ALJ: 1) erroneously found that her medical condition did not meet Step Two of the Five-Step Process for reviewing her claim; 2) failed to develop the record fully and fairly, in light of her mental impairment and her status as a pro se applicant; 3) failed to substantiate his findings that she lacked credibility; and 4) improperly evaluated her medical records. (Pl. Br., ECF No. 13).

### a. Five-Step Process and this Court's Standard of Review

Under the authority of the Social Security Act, the Social Security Administration has established a five-step evaluation process for determining whether a claimant is entitled to benefits. 20 CFR §§ 404.1520, 416.920. Review necessarily incorporates a determination of whether the ALJ properly followed the five-step process prescribed by regulation. The steps may be briefly summarized as follows:

**Step 1:** Determine whether the claimant has engaged in substantial gainful activity since the onset date of the alleged disability. 20 CFR §§ 404.1520(b), 416.920(b). If not, move to step two.

**Step 2:** Determine if the claimant's alleged impairment, or combination of impairments, is "severe." *Id.* §§ 404.1520(c), 416.920(c). If the claimant has a severe impairment, move to step three.

**Step 3:** Determine whether the impairment meets or equals the criteria of any impairment found in the Listing of Impairments. 20 CFR Part 404, Subpart P, Appendix 1, Part A. If so, the claimant is automatically eligible to receive benefits; if not, move to step four. *Id.* §§ 404.1520(d), 416.920(d).

**Step 4:** Determine whether, despite any severe impairment, the claimant retains the Residual Functional Capacity ("RFC") to perform past relevant work. *Id.* §§ 404.1520(e)-(f), 416.920(e)-(f). If not, move to step five.

**Step 5:** At this point, the burden shifts to the SSA to demonstrate that the claimant, considering her age, education, work experience, and RFC, is capable of performing jobs that exist in significant numbers in the

national economy. 20 CFR §§ 404.1520(g), 416.920(g); *see Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91–92 (3d Cir. 2007). If so, benefits will be denied; if not, they will be awarded.

As to all legal issues, this Court conducts a plenary review. *Schaudeck v. Comm'r of Soc. Sec.*, 181 F.3d 429, 431 (3d Cir. 1999). As to factual findings, this Court adheres to the ALJ's findings, as long as they are supported by substantial evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citing 42 U.S.C. § 405(g)). Where facts are disputed, this Court will "determine whether the administrative record contains substantial evidence supporting the findings." *Sykes v. Apfel*, 228 F.3d 259, 262 (3d Cir. 2000). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (citation omitted). That is "less than a preponderance of the evidence but more than a mere scintilla." *Id.*

> [I]n evaluating whether substantial evidence supports the ALJ's findings . . . leniency should be shown in establishing the claimant's disability, and . . . the Secretary's responsibility to rebut it should be strictly construed. Due regard for the beneficent purposes of the legislation requires that a more tolerant standard be used in this administrative proceeding than is applicable in a typical suit in a court of record where the adversary system prevails.

*Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (internal citations and quotations omitted). When there is substantial evidence to support the ALJ's factual findings, this Court must abide by them. *See Jones*, 364 F.3d at 503 (citing 42 U.S.C. § 405(g)).

This Court may, under 42 U.S.C. § 405(g) and the Third Circuit's *Podedworny* opinion, affirm, modify, or reverse the Secretary's decision, with or without a remand to the Secretary for a rehearing. *Podedworny v.*

*Harris*, 745 F.2d 210, 221 (3d Cir. 1984); *Bordes v. Commissioner*, 235 F. App'x 853, 865-66 (3d Cir. 2007).

Outright reversal with an award of benefits is appropriate only when a fully developed administrative record contains substantial evidence indicating that the claimant is disabled and entitled to benefits. *Podedworny*, 745 F.2d at 221-222; *Morales v. Apfel*, 225 F.3d 310, 320 (3d Cir. 2000); *see also Bantleon v. Comm'r of Soc. Sec.*, 2010 U.S. Dist. LEXIS 99537, at *38-39 (D.N.J. 2010).

Remand is proper if the record is incomplete, or if there is a lack of substantial evidence to support a definitive finding on one or more steps of the five step inquiry. *See Podedworny*, 745 F.2d at 221–22. Remand is also proper if the ALJ's decision lacks adequate reasoning or support for its conclusions, or if it contains illogical or contradictory findings. *See Burnett v. Commissioner of SSA*, 220 F.3d 112, 119–20 (3d Cir. 2000); *Leech v. Barnhart*, 111 F. App'x 652, 658 (3d Cir. 2004) ("We will not accept the ALJ's conclusion that Leech was not disabled during the relevant period, where his decision contains significant contradictions and is therefore unreliable."). It is also proper to remand where the ALJ's findings are not the product of a complete review which "'explicitly' weigh[s] all relevant, probative and available evidence" in the record. *Adorno v. Shalala*, 40 F.3d 43, 48 (3d Cir. 1994).

### b. The ALJ's decision

The ALJ truncated the five-step analysis at step two. At step one, the ALJ determined that Cintron had not engaged in substantial gainful activity since December 15, 2009, her alleged onset date. (R. 19). At step two, the ALJ conducted a two-part analysis pursuant to 20 CFR Pt. 404, Subpt. P, App. 1, and found that: 1) Cintron had "medically determinable impairments" of depression and anxiety; but 2) Cintron did not suffer from "severe impairment[s]" because her impairments did not

significantly limit her "ability to perform basic work-related activities for 12 consecutive months." (R. 19 (citing 20 CFR §§ 404.1521 *et seq.* and 416.921 *et seq.*)). In evaluating the "intensity, persistence, and limiting effects" of Cintron's impairments, the ALJ considered the four broad functional areas outlined in the regulation: 1) daily living, 2) social functioning, 3) concentration, persistence, or pace; and 4) episodes of decompensation. (R. 20–22); 20 CFR Pt. 404, Subpt. P, App. 1. The ALJ found that Cintron suffered from "mild limitation" in the first three functional areas and that she had not experienced any episodes of decompensation of extended duration. (R. 22–23). Overall, the ALJ found that Cintron's depression and anxiety have not have "any greater than a slight or minimal effect on her ability to perform basic work activities for 12 continuous months." (R. 23). The ALJ based this decision on differing GAF[2] estimates of Cintron's mental health, on the absence of "hospitalizations for mental impairment, outbursts, strained interpersonal relations, or aberrant behavior," on Cintron's "lack" of treatment record, and on her showing "little insight into her condition, and more often than not, little motivation to comply with recommended treatment." (R. 23–24).

As noted above, a negative finding at step two requires that benefits be denied.

Below is a summary of the evidence described by the ALJ based on his review of the record:

- Cintron's testimony: The ALJ conducted a hearing with Cintron on June 28, 2012 (R. 30–39). When asked about her past employment, Cintron testified that: 1) from 1995-2001, she worked for the Belleville Board of Education and was also a school bus driver, which required her to lift and carry

---

[2] A GAF (Global Assessment Functioning) score is a scale used by the American Psychiatric Association to evaluate mental disorders. *See* Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (4th ed. 2000) (DSM-IV).

wheelchairs at times; 2) from 2002 to 2004, she worked as a bus driver for Cross County Transportation; 3) from 2006 to 2007, she worked as a bus driver of a small bus or mini-van; and 4) in 2009, her only employment was delivering pizzas, and that she does not know of any self-employment, which was reported in her earnings record. (R. 20–21). When asked why she is disabled, Cintron reported "getting fired from jobs, crying, [and] not being able to concentrate or be around people." (R. 21). Cintron testified that she felt people were judging her, felt anxious, and avoided people by staying home. (R. 21). Cintron said she lived with her husband and two children, who are 18 and 25 years old, and that she does not do household chores. (R. 21). Instead, Cintron said she watched TV and slept during the day. (R. 21). Cintron testified that she cannot drive because of her constant crying, that she has trouble sleeping because she wakes up every hour, and that her energy level is low. (R. 21). Cintron said she does not have any hobbies or interests, her depression makes her feel worthless, and she thought about suicide a few months before the hearing. (R. 21). Cintron also reported that she hears people talking about her, fights with her family and does not like to be around them, spends most of her time in her room, and while working, fought with her coworkers, for which she was fired. (R. 21). Cintron said she felt nervous being at the hearing and that her husband drove her there. (R. 21).

- Family doctor treatment: Cintron had been receiving treatment for depression and anxiety since February 2005 by her general practitioner from Empire Medical Associates, which included a prescription for Prozac. (R. 21). The ALJ noted that the Prozac appeared to be helping her, since the record showed Cintron felt better and was not suicidal (R. 21 (citing Ex. 1F, p.16). Cintron's general practitioner treated her for depression and anxiety through February 2010. (R. 21). The ALJ determined this treatment "appeared to be effective, because it was not until June 2010, two months after her brother died, that her general practitioner referred her to a specialist." (R. 21 (citing R. 164–176)).

- <u>Dr. Kennedy</u>: In June 2010, Cintron was evaluated by Dr. Kennedy at Mountainside Hospital. (R. 21). Dr. Kennedy's report indicated that the referral was based on Cintron's continued reports of depression despite her treatment. (R. 21). Cintron told Dr. Kennedy that she was irritable, withdrawn, angry, upset, and that her irritability and anger had caused her to lose jobs in the past and had resulted in a physical altercation with a coworker. (R. 21). Dr. Kennedy estimated a GAF of 60, diagnosed Cintron with major depression, and for treatment, increased her dosage of Effexor and added Abilify. (R. 21). The ALJ noted that there were no additional records from Dr. Kennedy, despite Cintron's reports to another examiner that she received regular treatment from Dr. Kennedy. (R. 21).

- <u>S. Norgren, LPC</u>: In June 2010, Cintron was given a psychosocial assessment by S. Norgren, LPC (Licensed Professional Counselor), of Mountainside Hospital. (R. 21). Norgren found that Cintron sometimes managed daily activities, that she appeared to be dressed and acting appropriately during the interview with him, but that her mood was depressed and her concentration was impaired. (R. 21). Because of this, Norgren also diagnosed Cintron with major depression and an estimated GAF of 55. (R. 21 (citing R. 220–28)).

- <u>Dr. Fulford</u>: Cintron also underwent a mental status examination conducted by consultative examiner Dr. Paul Fulford, who diagnosed Cintron with dysthymic disorder and estimated what the ALJ described as a "highly functional" GAF of 65. (R. 21 (citing R. 229–31)).

- <u>Letter from sister, Ugaro</u>: In January 2011, Cintron's sister, Gladys Ugaro, who is a certified social worker, wrote a letter about Cintron's condition. (R. 21). Ugaro reported that Cintron could not maintain employment because of her severe depression, and that she suffered from "irritability, mood swings, social isolation, trouble sleeping and increased anxiety." (R. 22 (citing R. 151)).

8

- <u>First Northwest Essex evaluation</u>: In June 2011, Cintron was evaluated at Northwest Essex Community Healthcare. (R. 22). The interviewer observed that Cintron was fidgety, her affect was constricted, and her mood was anxious and depressed. (R. 22). Cintron complained of "difficulty with concentration and focus, sleep, appetite, and some loosening association at times." (R. 22). The interviewer diagnosed Cintron with a mood disorder, rule/out bipolar disorder and a GAF of 50. (R. 22). The ALJ found it significant that Cintron was advised to attend a partial care program by her intake worker, but was not willing to do so, and that Cintron missed appointments at Northwest Essex, which led the program to discontinue her treatment. (R. 22 (citing R. 235–43)).

- <u>Second Northwest Essex evaluation</u>: A second evaluation was done by Northwest Essex. To the second evaluator, Cintron reported that she "sometimes heard her name being called in the waking hours and . . . felt paranoid that people were talking about her." (R. 22). The second evaluator diagnosed Cintron with "major depression, single episode, severe with psychotic features, rule/out bipolar disorder; and alcohol abuse, and indicated a GAF of 60." (R. 22). The second evaluation reported that Cintron sought out treatment "to see if it would help and to satisfy her husband." (R. 22 (citing R. 244–55)).

In his analysis, the ALJ gave "substantial weight" to the evaluations by Dr. Fulford and Dr. Kennedy because those two doctors' findings—in particular, their GAF estimates—were consistent with one another and supported by "substantial evidence in the record, including the claimant's Function Report" (R. 24). The ALJ gave "some weight," but not "substantial weight," to the two evaluations from Northwest Essex Group, because the GAFs reported there "were inconsistent with each other in such a close period." (R. 24). Finally, the ALJ did not "grant any significant weight to the opinion of the claimant's sister" because she had

not treated Cintron in a professional capacity and "her familial relationship cannot be discounted," presumably as a source of potential bias (R. 24).

### c. Cintron's appeal

First, Cintron argues that the ALJ misapplied the severity standard in his step-two analysis by applying a "greater than slightness" standard and by "failing to expressly articulate a slightness or *de minimis* standard in the evaluation of Cintron's condition." (Pl. Br. 17). Cintron also argues that doubts at the step-two analysis were not resolved in her favor, as the case law requires. Second, Cintron argues that the ALJ did not fully develop the record in light of his heightened duty to do so because Cintron was a pro se applicant. (Pl. Br. 23). Third, Cintron argues that the ALJ erred in finding certain of Cintron's statements at the hearing not credible, as well as in discounting the significance of the letter from Cintron's sister. (Pl. Br. 28). Finally, Cintron argues that the ALJ erred in his review of the medical records by improperly rejecting one record, cherry-picking from two records, and giving insufficient reasons for the weight he assigned to two of the records. (Pl. Br. 34–40).

### d. Analysis

#### i. *ALJ's step-two review*

The Third Circuit has instructed that "the Commissioner's determination to deny an applicant's request for benefits at step two should be reviewed with close scrutiny." *McCrea v. Comm'r of Soc. Sec.*, 370 F.3d 357, 360 (3d Cir. 2004). "[B]ecause step two is to be rarely utilized as basis for the denial of benefits, . . . its invocation is certain to raise a judicial eyebrow." *Id.* at 361 (citing SSR 85–28, 1995 WL 56856, at *4 ("Great care should be exercised in applying the not severe impairment concept.")). Specifically, the Third Circuit has explained the step-two burden as follows:

The burden placed on an applicant at step two is not an exacting one. Although the regulatory language speaks in terms of "severity," the Commissioner has clarified that an applicant need only demonstrate something beyond "a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." SSR 85-28, 1985 WL 56856, at *3. . . . Any doubt as to whether this showing has been made is to be resolved in favor of the applicant. . . . In short, the step-two inquiry is a *de minimis* screening device to dispose of groundless claims.

*Id.* at 360 (internal quotations and citations omitted); *see also Newell v. Comm'r of Soc. Sec.*, 347 F. 3d 541, 546–47 (3d Cir. 2003).

This is not that "rare[]" case. *McCrea*, 370 F.3d at 361. The evidence here, even as presented and analyzed by the ALJ, surmounted the fairly low threshold of step two. With doubts resolved in Cintron's favor, this claim of impairment is not "groundless." *Id.* at 360.

The evidence presented by Cintron established that she has more than "a slight abnormality or combination of abnormalities." *Id.* Cintron has been diagnosed with major depression, severe with psychotic features, anxiety, rule/out bipolar disorder, and alcohol abuse. (R. 21–22). Her GAF has been estimated to be as low as 50. (R. 22).[3] Reports considered by the ALJ showed that Cintron suffered from impaired concentration, that she had difficulties with focus, sleep, and appetite, that she had some loosening association at times, that she was paranoid and sometimes heard her name being called, that she experienced passive suicidal ideation, and that she was irritable, had mood swings, and was socially isolated. (R. 21–22). These reports also indicated that Cintron's physicians increased the dosages of her medications and prescribed additional medications when her symptoms were not alleviated despite treatment. (R. 21; *see, e.g.*, R. 244–45). Testimony and

---

[3] Cintron's GAF has been estimated by multiple evaluators at different times, and has been reported to be: 50, 55, 60, 60, and 65. (R. 21–22).

reports have shown that Cintron had been fired from previous employment for crying and fighting with coworkers, that she has no interests or hobbies, and that she spends most days watching television and sleeping. (R. 34–36, 37, 221). Cintron also testified that she considered suicide as recently as two months prior to the hearing. (R. 36). The totality of this evidence establishes Cintron's severe impairment.

The ALJ thus erred in truncating his analysis at step two. The evidence presented by Cintron is enough to surpass this *de minimis* screening step. *McCrea*, 370 F.3d at 360. Moreover, the Third Circuit has frowned upon weighing and evaluating the medical evidence adduced by applicants at step two, as the ALJ has done in this case. *See Magwood v. Comm'r of Soc. Sec.*, 417 F. App'x 130, 132 (3d Cir. 2008) ("[T]he ALJ ignored *McCrea*'s instruction by weighing the medical evidence adduced by [the applicant] . . . against the consultative examination of a psychologist and a consultative review of a psychiatrist. This was error."). Rather, any doubts about the evidence at step two are to be resolved in the applicant's favor. *McCrea*, 370 F.3d at 360; *Newell*, 347 F.3d at 546–47.

I have determined that the case should have proceeded past step two and have remanded for further proceedings. Cintron raises objections to the manner in which the evidence was treated. Some of the alleged deficiencies, of course, arise only because the analysis was truncated at step two, and need not be discussed in detail. As a guide on remand, however, I briefly discuss some of the issues raised by Cintron.

### ii.  *ALJ's failure to develop the record*

Cintron argues that the ALJ failed to develop the record in light of Cintron's status as a pro se applicant, her impairments, and her limited education. (Pl. Br. 23). Specifically, Cintron argues that the ALJ did not sufficiently probe into Cintron's medical impairments, medical regimen,

12

medication and side-effects, suicidal ideations, auditory hallucinations, insomnia, panic attacks, and the reasons behind Cintron's missed appointments and refusal to participate in a treatment program. (Pl. Br. 25–26). Cintron and the Commissioner agree that the ALJ has a duty to develop the record, which is heightened because of Cintron's status as a pro se applicant.[4] (Pl. Br. 23; Def. Br. 7).

As a preliminary matter, Cintron appears to argue that as a matter of law, a 13-minute hearing producing a 12-page transcript demonstrates the ALJ's failure to develop the record. (Pl. Br. 24–25). That is not determinative in itself; the length of the hearing, however, may be considered by a court in determining whether an ALJ sufficiently developed the record. (Pl. Br. 25 (citing *Sears v. Bowen*, 840 F. 2d 394, 403 (7th Cir. 1988); *Moran v. Astrue*, 569 F.3d 108, 112–13 (2d. Cir. 2009); *Lashley v. Sec. HHS*, 708 F.2d 1048, 1051–52 (6th Cir. 1983))).

On remand, the ALJ should take care to sufficiently examine Cintron or obtain additional information to clarify several issues that relate to his finding of non-severity, but may also be relevant to steps 3, 4, or 5.

Suicidal ideation, for example, may be a symptom of a condition that, alone or in combination with others, may be disabling. At step two, the ALJ largely confined his analysis to the statement that Cintron "clearly cares about her daughter" because "[s]he cited her daughter as one of the reason[s] she would never act on passive suicidal ideation she occasionally experiences." (R. 22–23 (citing reports from Dr. Fulford and Northwest Essex)). Of course, suicidal ideation can be disabling even if the person possesses the mental resources to refrain from acting upon it.

---

[4] At the ALJ hearing on June 28, 2012, Cintron was represented by Phillip Pavlick, a third year law student. (R. 28–30). Because the parties agree there was a heightened duty to develop the record in this case, I do not address how this representation affects the ALJ's duty.

There is little analysis of the frequency, extent, and impact of suicidal ideation on Cintron's daily activities or ability to work. Such analysis would be appropriate, given that almost every medical evaluator at least referred to Cintron's suicidal ideation.

The evidence of suicidal ideation may require probing, by obtaining additional medical evidence or by eliciting testimony from Cintron. On June 28, 2012, Cintron indicated to the ALJ that she thought about suicide as recently as a couple of months prior to the hearing. (R. 36). The entire exchange consisted of two questions with short answers.[5] The ALJ did not follow up or obtain additional medical evidence as to the frequency, extent, or impact of such thoughts. At the very least, the evidence currently of record must be analyzed and discussed. Such evidence includes the following:

R. 179 (primary care records from 2005 state that, under medication, she was "feeling better" and "not suicidal"); R. 164 (June 21, 2010 record from primary care physician that Cintron had "suicidal ideation"); R. 225 (June 30, 2010 evaluation by Norgren checked "yes" for the box next to suicidal ideation); R. 219 (August 4, 2010 evaluation by Dr. Kennedy that Cintron "says a couple of years ago she had some suicidal feelings but not recently"); R. 230 (November 7, 2010 evaluation by Dr. Fulford that "in the past she did think that life was not worthwhile, but now she thinks of her daughter and believes it is"); R.

---

[5] The entire testimony on suicidal thoughts consists of the following:

    Q: Have you ever thought about committing suicide, Ms. Cintron?
    A: Yes, I have. Yes.
    Q: How recently?
    A: A couple of months ago.

(R. 36). Certainly there is no absolute requirement that evidence must come in the form of testimony at a hearing. However, given the ambiguities in the record about suicidal ideation, and the ALJ's heightened duty to develop the record, the ALJ should either have examined Cintron about this or obtained additional medical reports to clarify this issue.

246 (June 6, 2011 evaluation from Northwest Essex that "sometimes she thinks about 'taking my pills' but she 'think about my daughter' and this stops her"); R. 254 (note in same evaluation that Cintron has a "family history of suicide attempt[s]" and that she has a "passive SI [suicidal ideation] with a plan in the past year"); R. 236 (June 22, 2011 evaluation from Northwest Essex, reporting statement by Cintron that "Sometimes I think I want to end it by taking pills I was close to doing it but did not—because I love my daughter and she needs me").

Another area that should be explored on remand is Cintron's medical treatment. The ALJ concluded that "the claimant's treatment record, or lack thereof, speaks for itself," that Cintron displayed "an unwillingness to participate in a partial care program," and that "the claimant showed little insight into her condition, and more often than not, little motivation to comply with recommended treatment." (R. 24). That conclusion seemingly rested on a June 22, 2011 statement from an evaluator at Northwest Essex, who reported that Cintron was unwilling to attend a partial care program. (R. 235).

Other evidence, however, is to the contrary; if it is to be rejected, it must be discussed and discounted for a valid reason. Cintron's primary care records reveal prescriptions and visits to her primary care doctor to seek treatment as far back as 2005. (R. 164–183). Her visits with Dr. Kennedy and Ms. Norgren from Mountainside, and her visits with professionals from Northwest Essex reveal at least some treatment history. Also, as the ALJ acknowledges, Cintron told Dr. Fulford that she visited Dr. Kennedy and another therapist regularly. (R. 35; R.230 ("She is currently in treatment with a Dr. Kenny [Kennedy] of Mountainside Hospital in Montclair, N.J. She started treatment there 5 months ago. Her last visit was 2 weeks ago. She sees a therapist, but does not know the name of the therapist.")). The ALJ noted that there were no treatment records from Dr. Kennedy that show an ongoing treatment relationship.

But Cintron also testified at the hearing that she continues to see a mental health professional,[6] a statement that should have been followed up. (R. 35). In short, the treatment record has not been adequately explored. (R. 23).

Other topics that may require discussion or exploration on remand include Cintron's prescriptions and any potential side effects; the effectiveness of her current prescriptions and any treatment she was receiving; the voices that Cintron reported occasionally hearing; her reported panic attacks; and her difficulties with sleep. (Pl. Br. 25–26).

An ALJ need not necessarily probe into every listed symptom that every claimant reports. The proceedings here, however, must be expanded on remand in order to fulfill an ALJ's heightened duty to develop the record with pro se applicants.

### iii.  *ALJ's evaluation of the medical records*

Cintron argues that the ALJ did not adequately consider the report from Sandra Norgren, LPC, and the two reports from Northwest Essex (Pl. Br. 38–40). On remand, the ALJ should take care explain his reasoning in evaluating the medical records. In particular, the ALJ must either credit the Norgren report or give his reasons for discrediting it, in whole or in part. For the Northwest Essex reports, or any other reports that are not accepted or rejected in their entirety, the ALJ must explain

---

[6] It is not clear from the hearing testimony, and the ALJ did not attempt to clarify, who Cintron sees for treatment and how frequent her visits are:

Q: So how do you occupy your day all day every day?
A: Just watch TV and then sleep most of the time. I go to the psychiatrist whenever I have to go.
Q: How often do you go?
A: Once a month. Therapist I go one, one a week.

From this testimony, it is not clear whether Cintron meets with a psychiatrist monthly and a therapist weekly, as her statements to Dr. Fulford seem to suggest, or whether Cintron was saying that the psychiatrist and therapist were one person. Either way, the ALJ did not continue with this line of questioning to clarify the issue.

why certain portions of a report are discredited and others are relied upon.

A district court reviewing an ALJ's decision "need[s] from the ALJ not only an expression of the evidence [he] considered which supports the result, but also some indication of the evidence which was rejected." *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981) (citing *Dobrowolsky v. Califano*, 606 F.2d 403 (3d Cir. 1979). The Third Circuit has repeatedly explained that, without a clear indication from the ALJ of the evidence that was rejected and the reasons for rejecting it, a district court cannot uphold the ALJ's decision:

> [U]nless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

*Id.* (quoting *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979)) (internal quotations omitted). An ALJ may not "reject evidence for no reason or for the wrong reason." *Id.* at 706; *see also Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) ("the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason") (citation and quotation omitted). Therefore, "an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Id.* at 706–07.

This need for explanation is "particularly acute" when the ALJ "has rejected relevant evidence or when there is conflicting probative evidence in the record." *Id.* at 706. Evidence to be considered and weighed on remand should include the following:

### 1. Norgren report

Cintron argues that the ALJ did not adequately consider a report from Sandra Norgren, LPC ("Licensed Professional Counselor"), who evaluated Cintron on June 30, 2010. (Pl. Br. 38). Although Ms. Norgren, a licensed professional counselor, does not fall under the "[l]icensed physicians" category under the regulations, she is clearly an acceptable "[m]edical source" under the "[o]ther sources" category, which states that "[o]ther sources include, but are not limited to . . . medical sources not listed in paragraph (a) of this section (for example, . . . therapists)." 20 CFR §§ 404.913, 404.1513. As the Social Security Administration has instructed:

> Opinions from these medical sources, who are not
> technically deemed 'acceptable medical sources' under our
> rules, are important and should be evaluated on key issues
> such as impairment severity and functional effects, along
> with the other relevant evidence in the file.

Titles II & XVI: II & XVI: Considering Opinions & Other Evidence from Sources Who Are Not "Acceptable Med. Sources" in Disability Claims; Considering Decisions on Disability by Other Governmental & Nongovernmental Agencies, SSR 06-03P (S.S.A. Aug. 9, 2006).

Although the ALJ briefly described Norgren's evaluation, the ALJ did not explain whether he credited this evidence, and if he rejected the evidence, what his reasons were for the rejection. (R. 21). The analysis on remand, which will of course proceed past step 2, should include an evaluation of the Norgren report.

### 2. Northwest Essex reports

Cintron argues the ALJ's evaluation of Northwest Essex reports was deficient because: 1) the ALJ "cherry-picked" certain facts from the reports to support his findings; and 2) the ALJ's reasons for only giving

18

the Northwest Essex reports "some weight" as opposed to "substantial weight" are faulty. (Pl. Br. 35–40).

### a. Cherry-picking

An ALJ cannot rely on portions of documents from the record without also refuting "the statements made therein that contradict his findings." *Cadavid v. Comm'r of Soc. Sec.*, No. CIVA 12-7214 JLL, 2014 WL 839453, at *9 (D.N.J. Feb. 26, 2014) (not precedential). Although the ALJ concluded that as a whole, the Northwest Essex reports were to be given only "some weight" as opposed to "substantial weight," he did not explain why certain portions of the reports were credited over others. This should be remedied on remand. *See Morales v. Apfel*, 225 F.3d 310, 318 (3d Cir. 2000) (ALJ may not rely on those "pieces of the examination reports that support[] [his] determination" while "ignoring ultimate conclusions and medical symptomatology").

In his determination, the ALJ credited those portions of the Northwest Essex evaluations that reported that Cintron had "good hygiene," that she was "casually, neatly, and appropriately dressed," that her "recent and remote memory were intact," and that she would not act on her suicidal ideation because of her daughter. (R. 22, 23). However, the ALJ did not explain why he discredited other contradictory portions of the reports that said that Cintron "sometimes heard her name being called in the waking hours and that she felt paranoid that people were talking about her," that her "affect was constricted," that "her mood was anxious and depressed," and that she complained of "difficulty with concentration and focus, sleep, appetite, and some loosening association at times." (R. 22 (citing R. 235–42, 246–55)).

On remand, the ALJ should explain why certain portions of the reports are credited and others are not.

### b. GAF Scores

An ALJ may not "reject evidence for no reason or for the wrong reason." *Cotter*, 642 F.3d at 706; *see also Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) ("the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason") (citation and quotation omitted). In this case, the ALJ did not have sufficient evidence in the record to support his determination to give only "some weight" as opposed to "substantial weight" to the Northwest Essex reports based on differing GAF estimates.

As the ALJ himself noted, "GAF scores are essentially general educated guesses of the overall mental functioning of an individual and are not precise diagnostic assessments of the ability to function." (R. 23). Thus, it is entirely plausible that evaluations conducted weeks apart may yield differing GAF scores. There is nothing in the record to inform the ALJ as to how often a GAF estimate can plausibly change, and how large of a change would be indicative of an inconsistency in evaluations. Even accepting the ALJ's conclusion that the differing GAF scores were probative of the credibility of the findings, it is not at all clear that *both* evaluations should have been discarded without further explanation. On remand, the ALJ should provide further justification if the Northwest Essex reports are discredited.

**III.    CONCLUSION**

For the foregoing reasons, the ALJ's decision is remanded for further proceedings consistent with this Opinion.

Dated: December 2, 2014

**KEVIN MCNULTY**
**United States District Judge**